## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| RECO REED, # B-18431, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 18-cv-1182-JPG |
| | ) |
| DENNIS LARSON and WEXFORD | ) |
| HEALTH SOURCES, INC., | ) |
| | ) |
| Defendants. | ) |

## SECOND AMENDED COMPLAINT FOR INJUNCTIVE AND MONETARY RELIEF AND JURY DEMAND[1]

NOW COMES the Plaintiff, Reco Reed, by and through his attorney, Thomas J. Pliura, M.D., J.D., and complaining of Defendants Dennis Larson, M.D., and Wexford Health Sources, Inc., respectfully states as follows:

### General Allegations
### Parties

1. At all times relevant hereto, Plaintiff was and is an inmate of the Illinois Department of Corrections (IDOC) and housed at the Centralia Correctional Center and then later the Big Muddy River Correctional Center in Ina, Illinois.

2. At all times relevant hereto, Defendant Dennis Larson, M.D., was and is a physician, licensed to practice medicine by the State of Illinois, an agent or employee of Co-Defendant Wexford, and engaged in the practice of providing medical care services to inmates of the IDOC, including the Plaintiff herein.

---

[1] Plaintiff's Second Amended Complaint is filed pursuant to the June 10, 2019 order of the Court granting leave to file an amended complaint that removes the *respondeat superior* claim against Wexford Heath Sources, Inc.

3. At all times relevant hereto, Defendant Wexford Health Sources, Inc., was and is a Florida For-Profit Corporation authorized to do business in Illinois or otherwise doing business in Illinois, and engaged in the practice of providing contracted health care services to inmates of the IDOC, including Centralia and Big Muddy River Correctional Centers.

## Venue

4. Venue is proper under 28 U.S. Code  1391 (b)(1) as the district of residence, at the time this action was initially filed, of one or more defendants and under Section 1391 (b)(2) as the District in which a substantial part of the events giving rise to the claim occurred.

## Jurisdiction

5. This Court has jurisdiction over Plaintiff's claims under 28 U.S.C. § 1331 and 1343 because the claim raises Federal Questions as to the deprivation of Plaintiff's rights under 42 U.S.C. § 1983 and under the Eight Amendment to the Constitution.

## Common Factual Allegations

6. In 2011, Defendant Wexford Health Sources, Inc. entered into a 10-year, $1.36 billion contract with the State of Illinois to provide health care services to Illinois prison inmates.

7. As an inmate of the Department of Corrections, Plaintiff's only access to medical care is through the prison healthcare system.

8. In March 2017, while housed at Centralia, Plaintiff developed abdominal pain.  He was seen by the prison HCU at that time and diagnosed as having a right inguinal hernia.

9. An abdominal wall hernia occurs when an organ or other tissue is forced through a weak spot in the abdominal wall. An inguinal hernia occurs when contents of the abdomen— including intestines and fat—bulge through a tear or weakness in the groin area (where

the lower abdomen meets the inner thigh). The tissue may recede back into the abdomen and then bulge out again, depending on the patient's position and activity.

10. Inguinal hernias are a type of abdominal wall hernia and the most common type of hernia. In men, inguinal hernias can cause internal tissue to be forced into the scrotum, pressing on the testicles and causing severe pain.

11. At all times relevant hereto, it was the policy of Defendant Wexford, either through an official policy or decision by a policy-making authority or through a long-standing and widespread custom or practice to deny or delay referrals by physicians, nurses, physician's assistants and nurse practitioners within the prison healthcare unit to physicians outside the prison system for specialty medical and surgical consults and services.

12. Wexford's policies, practices and customs of denying or delaying necessary care have resulted in numerous suits filed against it alleging deliberate indifference and/or medical negligence.

13. At all times relevant hereto, Defendant Wexford utilized a system in which its employed or contracted physicians, nurse practitioners, physician's assistants and/or nurses could not make a referral of an inmate for specialty care services including surgery without the permission of Wexford through a review process known as "collegial review".

14. Additionally, at all times relevant here to, Wexford maintained a written policy and general practice of refusing to authorize surgical repair of abdominal hernias unless they become strangulated or incarcerated.

15. Abdominal hernias often cause severe pain, which typically worsens with activity or exertion. Routine and necessary activities such as walking, running, lifting, coughing,

urinating, defecating, and even sitting up can cause the tissue to bulge out of the abdominal wall, causing intense and excruciating pain. Hernias can be so painful that they prevent people from engaging in any activities, forcing patients to be bedridden. Other symptoms of inguinal hernias include weakness, feelings of heaviness, burning, tearing, or aching in the groin; or a swollen or enlarged scrotum. If left untreated, a hernia can lead to serious complications, including the intestines becoming trapped in the scrotum or the abdominal wall, which can lead to bowel obstructions, tissue necrosis, sepsis, the excision of intestines, and even death.

16. There is no connection between the size of the hernia and the amount of pain it produces. That is, smaller hernias can be just as painful, or more so, than larger hernias.

17. An abdominal wall hernia wherein the bulging tissue can be pushed back into place is a reducible hernia. Many times, however, the bulging tissue will become trapped and cannot be pushed back into place—this is a non-reducible or incarcerated hernia. Reducible hernias can be just as painful (or more so) than non-reducible hernias. Many hernias are reducible at times and nonreducible at others. A reducible hernia can become permanently non-reducible and incarcerated at any time.

18. A prisoner with an abdominal wall hernia who is expected to walk and stand in straight lines on the prison compound cannot simply lie down on the ground to push his intestines back into place whenever the hernia bulges out of his abdominal wall.

19. If an incarcerated hernia is untreated, it can become strangulated, meaning the blood supply to the bulging tissue is cut off, causing the tissue to die. This is an emergency situation requiring immediate surgery. Failure to treat a strangulated hernia can lead to severe infection, intestinal obstruction, the excision of intestines, and death.

20. The only definitive treatment for an abdominal wall hernia is surgical repair. Without surgery, the tear or weakness in the abdominal wall will never heal, and the patient will continuously suffer from intense pain, discomfort, and limited activity; as well as the risk of infection, intestinal obstruction, and death. The risk of developing complications increases as more time elapses without treatment.

21. Thus, the proper treatment for a hernia begins with referral to a surgeon for a surgical consultation. The generally accepted medical practice for a patient with a hernia is to perform surgery if the patient is symptomatic; that is, experiencing pain, an inability to walk, an inability to work or engage in other normal life activities, or other symptoms.

22. A "hernia belt," truss, jock strap, or other binding options are not treatment for hernias. They are often unhelpful, do nothing to treat the condition, and can actually be harmful.

23. The medical standard of care for a patient with a symptomatic hernia is surgical repair as soon as possible after detection and determination that the hernia is adversely affecting the patient's activities of daily living. The medical standard of care requires the medical decision-maker to consider and take into account whether the patient is experiencing pain from the hernia, when determining if the patient is a candidate for surgery. Basing the decision to perform surgery solely on whether the hernia is reducible, irrespective of other symptoms, falls far below accepted medical practice and the standard of care.

24. Surgery to repair abdominal wall hernia is one of the most common surgeries performed in the United States. It is a relatively simple procedure. Some statistics suggest that more than 1 million abdominal wall hernia repairs are performed each year in the United States, with inguinal hernia repairs constituting nearly 770,000 of these cases.

25. On April 1, 2017, Plaintiff was seen again in the prison Healthcare unit for his painful abdominal hernia.  He was not referred for surgery at that time but was instead provided a hernia belt, meant to be a *temporary* assistive device for painful abdominal hernias, but prescribed in this instance for "six months".  He was also advised to limit his activity by avoid straining.

26. On April 11, 2017 he was actually provided the hernia belt. Again, he was not referred to a surgeon for repair.

27. He was seen again on April 24, 2017 for his painful hernia and was again not referred for surgery.

28. In June 2017 he was seen again in the prison HCU because of the hernia belt was causing painful irritation to his skin.  He was given a skin cream but no other treatment for the painful hernia and no referral for repair surgery.

29.  In late July 2017, Plaintiff was transferred to Big Muddy River Correctional Center.

30. On November 22, 2017, Plaintiff attempted to be seen for a worsening of his hernia but was denied care when he refused to pay the $5.00 copay for a preexisting problem.

31. On or about November 25, 2017, Plaintiff filed a grievance, (a copy of which is attached hereto and incorporated herein, along with two other grievances addressed below, as **Exhibit A**) complaining, *inter alia*, of deliberate indifference to his painful abdominal hernia, objecting to being charged a $5.00 copay for this ongoing condition and not receiving proper treatment, and demanding money damages.  Plaintiff exhausted his administrative appeals related this grievance.

32. In December 2017, Plaintiff experienced a further worsening of his condition when he coughed and his hernia protruded into his scrotum, causing severe pain, swelling and a

golf-ball sized mass.  He was not seen by a physician at that time, but was instead required to wait until January 3, 2018.

33. On December 25, 2017, Plaintiff filed an emergency grievance related to his hernia.  It was rejected as an emergency by an IDOC official with no medical training, though not within the required 72-hour period.

34. On December 31, 2017, Plaintiff filed another grievance and this time, out of fear (based upon information and belief) that the grievance would be torn up at the institutional level, forwarded a duplicate of the grievance on the same issue to the Administrative Review Board.  As with the December 25 grievance, it was rejected without addressing, let alone correcting the issue raised on each of the three grievances filed.  On information and belief, the copy filed at the institutional level on December 31, 2017 was destroyed, lost or otherwise not processed by the grievance counselor.

35. On or about January 3, 2018, Plaintiff was seen by Defendant Larson.  At that time his hernia was significantly larger and more painful. Again, he was not referred to a surgeon for repair of his worsening hernia.

36. Throughout January and February 2018 he continued to suffer from the painful hernia "popping out" and from the painful skin rash from the hernia belt.

37. On or about February 24, 2018, Plaintiff was seen again in the Healthcare unit for his hernia.  He complained of being unable to keep the hernia reduced, meaning that it continued to "pop out" and he was unable to keep in from protruding.  He was seen by Defendant and again, no referral was made for surgery.

38. Throughout March, April and May, Plaintiff continued to suffer from both the painful abdominal hernia and the painful skin rash caused by the hernia belt. He was seen by

Defendant and others within the prison healthcare unit but never referred on for surgery and never presented for collegial review.

39. On June 13, 2018 he was again seen by Defendant because of his hernia.  He again reported pain, an inability to reduce the hernia and problems with the belt that he had been using now since April 2017.  On this date it was finally determined to submit his case to the collegial review process for surgical evaluation.

40. On June 19, 2018, Plaintiff's case was submitted for the first time for collegial review. He was approved for surgical consultation to take place August 2, 2018.

41. He was seen again by Defendant on July 10, 2018 with progressive worsening of his hernia.

42. On August 9, 2018 he saw the surgeon, Dr. Dalencourt who recommended surgical repair with mesh of Plaintiff's large right inguinal hernia.

43. Thereafter, on August 21, 2018, Plaintiff was again presented for collegial review for approval of the surgery recommended by Dr. Dalencourt, as the first approval was only for a consultation.  Surgery was approved and scheduled for September 14, 2018.

44. On September 21, 2018, Dr. Dalencourt performed a robot-assisted laproscopic hernia repair with mesh

45. Following surgery, Plaintiff discovered that his right testicle was missing.  He presented to the emergency room at Good Samaritan Hospital in Mount Vernon, where it was determined that his right testicle was now up in his inguinal canal.

46. On October 5, 2018, Plaintiff was again presented for collegial review, this time to authorize a procedure to correct his retracted right testicle.

47. A retracted testicle is a serious and potentially life threatening complication because, if left in place, a patient is at an increased risk of developing testicular cancer.

48. Thereafter, on or about October 19, 208, Plaintiff underwent a second procedure to bring the testicle back down into the scrotum form the inguinal canal.

49. That surgery, however, was unsuccessful and Plaintiff continues to suffer form a retracted right testicle.  In addition to the increased risk of cancer, Plaintiff suffers from significant pain and also a loss of sensation or feeling in his scrotum.

50. As of this filing, Plaintiff is awaiting further care.

### Count I

Plaintiff complains of Defendant Wexford Health Sources, Inc., as follows:

1.   -   50, Plaintiff realleges paragraphs 1-50 of the general allegations above as paragraphs 1-50 of this Count I.

51. Deliberate indifference to a serious medical need violates an inmate's right under the Eighth Amendment of the Constitution of the United States to be free from cruel and unusual punishment.

52. At all times relevant hereto, it was the policy of Defendant Wexford, either through an official policy or decision by a policy-making authority or through a long-standing and widespread custom or practice to deny referral for hernia repair unless the hernia became strangulated or incarcerated; a potentially life-threatening emergent condition.

53. This policy is so pervasive within the Wexford system that physicians and non-physician providers are well aware of the expectation that inmates with painful abdominal hernias that are not life threatening are to be treated conservatively even where that treatment is wholly ineffective at ameliorating their symptoms and limitations.

9

54. Notwithstanding Plaintiff's 8th Amendment rights and with deliberate indifference thereto, Defendant, by policy, denied and delayed needed surgical referral and authorization in favor of ineffectual conservative treatment.

55. Policy-making officials at Wexford are aware that inmates with painful abdominal hernias that are not at a life-threatening stage are routinely denied surgical referral either because they are not presented at the collegial review process or they are routinely denied referral upon presentation.

56. Further, through its collegial review process as defined by written policy and pervasive practice, Wexford further delays surgical repair of hernias by requiring first a collegial review approval for surgical consultation, then a separate collegial review for surgical approval, and, where applicable as in this case, even additional collegial review for authorization to treat complications form the approved surgery. The result of this process is a lengthy delay in an inmate receiving definitive care.

57. As a direct and proximate result of the deliberate indifference of the Defendant, Plaintiff was caused to incur pain, suffering, increased disability, a worsening of this condition, a much more difficult surgery, surgical complications, additional surgery, a prolonged recovery, and other damages for which Defendant is liable.

WHEREFORE, Plaintiff, Reco Reed, prays for judgment in his favor and for the following relief:

A) Injunctive Relief in the form of an order compelling Defendant to rescind its unconstitutional and medically unsound hernia policy,

B) Monetary Relief in the form of money damages adequate to compensate him for his injuries,

10

C) Punitive Damages appropriate to deter Defendant's wrongful conduct;

D) Attorney fees under 42 U.S.C.§ 1988; and

E) Such other and further relief as this Court may deem proper.

### Count II

Plaintiff complains of Defendant Dennis Larson, M.D., as follows:

1. - 50, Plaintiff realleges paragraphs 1-50 of the general allegations above as paragraphs 1-50 of this Count II.

51. Deliberate indifference to a serious medical need violates an inmate's right under the Eighth Amendment of the Constitution of the United States to be free from cruel and unusual punishment.

52. Defendant Larson knew that Plaintiff had a serious medical need and disregarded that need by failing to take reasonable measures to properly address it as Plaintiff's condition worsened.

53. Defendant Larson acted with deliberate indifference to a serious medical need of the Plaintiff by, *inter alia*;

   a. Failing or refusing to timely refer him to surgical specialist outside the prison healthcare unit;

   b. Failing or refusing to ensure Plaintiff received timely necessary surgical care;

   c. Persisting in a course of treatment known to be ineffective;

   d. Following a hernia treatment policy and practice that constituted such a substantial departure from accepted professional judgment, practice, or standards that the resultant non-treatment was not based on professional judgment;

   e. Failing to timely initiate the Wexford collegial review process to secure timely referral of Plaintiff for surgical consultation and eventual surgery.

f.   Otherwise failing to take reasonable measures to address Plaintiff's serious medical condition.

54. As a direct and proximate result of the deliberate indifference of the Defendant, Plaintiff was caused to incur pain, suffering, increased disability and other damages for which Defendant is liable.

WHEREFORE, Plaintiff, Reco Reed, prays for judgment in his favor and for the following relief:

A)   Injunctive Relief in the form of an order compelling Defendant to afford plaintiff proper, complete, medical care including, referral to a physician and/or referral outside of the prison healthcare system as warranted.

B)   Monetary Relief in the form of money damages adequate to compensate him for his damages,

C)   Punitive Damages appropriate to deter Defendant's wrongful conduct;

D)   Attorney fees under 42 U.S.C.§ 1988; and

E)   Such other and further relief as this Court may deem proper.

By:  s/THOMAS J. PLIURA_____
Reco Reed, Plaintiff by
Thomas J. Pliura, M.D., J.D., his attorney

**Jury Demand**

Plaintiff demands a trial by jury on all counts herein.

By:  s/THOMAS J. PLIURA_____
Reco Reed, Plaintiff by
Thomas J. Pliura, M.D., J.D., his attorney
P.O. Box 130
LeRoy, IL 61752
Telephone:  (309)962-2299
Fax:  (309)962-4646
tom.pliura@zchart.com

12