IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| RECO[1] REED, #B18431, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 18-cv-01182-JPG |
| | ) |
| WEXFORD HEALTH SOURCES, INC., | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM & ORDER**

**GILBERT, District Judge:**

During his incarceration at Big Muddy River Correctional Center, Plaintiff Reco Reed suffered from an inguinal hernia that grew from a small lump in his lower abdomen when he arrived at the prison in July 2017 to a massive protrusion in his scrotum a year later. The prison's medical staff told Reed that the hernia was "reducible." They recommended simply pushing it back in place and wearing a hernia belt for support.

Reed claims the hernia was "incarcerated," or trapped. When he attempted to push it back in place, the hernia would pop out as soon as he coughed, sneezed, or stood, resulting in significant pain. The hernia belt didn't work and also caused a rash. Reed's prison health care providers eventually offered ointment for the rash and Tylenol for pain, but Reed was not referred for surgery. For over a year at Big Muddy, the hernia grew until it descended halfway down Reed's leg, by his own account. When Wexford Health Sources, Inc. finally approved him for surgery after he filed this lawsuit, Reed suffered from complications including a retracted testicle, nerve damage, chronic pain, inflammation, and blood clots. He ultimately lost a testicle.

---

[1] The Court will refer to Plaintiff by the name he used in his Complaint: "Reco Reed." However, the Court notes that Reed is also referred to as "Rico Reed" in other documents on file in this matter. (*See* Doc. 10, p. 1 n.1 (citing Doc. 1, pp. 11, 15-16, and 21-26)).

1

On May 31, 2018, Reed filed this civil rights action pursuant to 42 U.S.C. § 1983 for inadequate medical treatment of his inguinal hernia at Big Muddy.  (Doc. 1).  In the original Complaint, Reed asserted an Eighth Amendment deliberate indifference claim against Dr. Dennis Larson, the prison physician employed by Wexford, for failing to provide him with pain relief treatment for his hernia (Count 1) and an Eighth Amendment deliberate indifference claim against Dr. Larson for denying Reed surgery to correct his hernia (Count 2).  Both claims survived review under 28 U.S.C. § 1915A.  (Doc. 10).

Reed later filed a Second Amended Complaint to add an Eighth Amendment deliberate indifference claim against Wexford for its policy, practice, or procedure of denying hernia repair surgery requests unless the hernia was strangulated or incarcerated (Count I) and an Eighth Amendment deliberate indifference claim against Wexford and Dr. Larson for knowingly disregarding Reed's serious medical need by failing to take proper measures to treat the hernia as it worsened (Count II).  (*See* Doc. 49).  The Court allowed Reed to proceed with Count I against Wexford and Count II against Dr. Larson, but dismissed Count II against Wexford because the claim against the private medical corporation was based on a *respondeat superior* theory of liability not recognized under Section 1983.  (Doc. 48).  The Court later dismissed Count II against Dr. Larson at summary judgment on the issue of exhaustion.  (Doc. 64).

What remains is Count I against Wexford for its policy, practice, or procedure of denying hernia surgery unless the hernia is strangulated or incarcerated.  (*Id*.).  Wexford filed a motion for summary judgment on the merits of this claim, arguing, first, that Reed cannot present sufficient admissible evidence of an underlying constitutional violation and, second, that Reed cannot establish that the private corporation, through its systemwide policies, practices, or procedures, was a moving force in any alleged constitutional violation.  (Doc. 69).

2

Reed opposes summary judgment. (Doc. 77). He argues that the nearly year-long delay in surgery constituted deliberate indifference to his serious medical needs, prolonged his pain, and resulted in post-operative complications. (*Id*.). He blames Wexford's policy, practice, or procedure of delaying or denying surgical referrals for painful hernias that are deemed reducible by taking a "wait and watch" approach. (*Id*.). Reed points out that he was only approved for surgery after his hernia became incarcerated, he filed this lawsuit, and/or Wexford's hernia policy came under attack in this and other lawsuits. Reed maintains that there is sufficient evidence of a genuine factual dispute regarding the underlying constitutional violation and the motivating policy, pattern, or practice to survive summary judgment. (*Id*.).

For the reasons discussed in more detail below, Wexford's Motion for Summary Judgment (Doc. 69) shall be **DENIED**, and Wexford's related Motion to Strike Dr. DeMattei's Declaration (Doc. 81) shall be **DISMISSED**.

## FACTS

The following facts are offered in the light most favorable to Reed because he is the non-moving party. *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757 (7th Cir. 2021).

Reed is an inmate in the custody of the Illinois Department of Corrections ("IDOC") and transferred from Centralia Correctional Center ("Centralia") to Big Muddy River Correctional Center ("Big Muddy") in July 2017. (Doc. 70, ¶ 1; Doc. 77, ¶ 1). He was housed at Big Muddy during the relevant time period. Wexford Health Sources, Inc. ("Wexford") is a private medical corporation that employed health care providers to treat Reed and other inmates.

Several months before he transferred from Centralia, Reed discovered a small lump in his lower abdomen. (Doc. 70, ¶ 2; Doc. 77, ¶ 2). He was diagnosed with an inguinal hernia, which is a protrusion of tissue through a weak spot in the abdominal muscle. (Doc. 70, ¶ 3; Doc. 77, ¶ 3).

He was issued a hernia belt at Centralia, while the hernia was small and asymptomatic. (Doc. 77, ¶ 3). Reed had no complaints about his care at Centralia. (*Id*.).

When he arrived at Big Muddy in late July 2017, Reed's hernia was still small. (*Id*.). Although Reed brought the hernia belt with him, Big Muddy's staff confiscated and returned it to him at various times. (*Id*.). Meanwhile, Reed's hernia began to steadily increase in size, protrude into his scrotum, and cause him pain. The belt caused a rash and did not prevent the hernia from protruding into his scrotum. (*Id*.).

In November 2017, Plaintiff's hernia popped out when he sneezed, and it descended ten inches into his scrotum. (Doc. 77, ¶ 6). Reed met with a nurse to discuss his condition on December 16, 2017. (*Id*. at ¶ 5). Reed complained that the hernia popped out when he coughed or stood. (*Id*.). Each time this occurred, he suffered pain. (*Id*. at ¶ 8). Although the nurse instructed him to "reduce it" by pushing the hernia back into its compartment, the hernia would not stay there. (*Id*.). Each time Reed attempted the procedure, he experienced the same result; the hernia would soon pop out again. (*Id*.). The nurse ordered a follow-up with Dr. Larson, Big Muddy's Medical Director. (*Id*.).

Dr. Larson finally met with Reed in January 2018. (Doc. 77, ¶ 9). At the appointment, Reed explained that he was unable to reduce the hernia on his own. (*Id*. at ¶ 7). Even as Reed insisted that it would pop out whenever he attempted to reduce it, Dr. Larson noted that the hernia was "easily reducible." (Doc. 70, ¶ 7; Doc. 77, ¶ 7). Dr. Larson recommended continued use of the hernia belt for support and use of ointment for the rash it caused. (*Id*.). Dr. Larson also told Reed that the hernia would not be surgically repaired unless it became strangulated, but Reed did not know what this meant. (Doc. 77, ¶ 9).

Regardless, Reed received no treatment for his pain or his hernia. (*Id*. at ¶ 8). At an appointment the following month, Reed reported that he never received ointment and could not wear the hernia belt because it caused a rash and was ineffective. (*Id*. at ¶¶ 8-9). It is unclear whether he was even in possession of the hernia belt at the time. (*Id*.). Despite receiving ointment in February and April 2018, Reed continued to complain about the painful and enlarging hernia, which grew to sixteen inches in size. (Doc. 70, ¶ 11; Doc. 77, ¶¶ 2, 11).

In April 2018, Reed maintains that medical staff recommended a referral for surgery consultation, but Wexford denies that any referral request was made at that time. Reed continued to complain of a painful and increasingly large hernia that was not reducible. Wexford claims that he continued to refuse treatment for his reducible hernia.

After meeting with Dr. Larson, who still described the hernia as "easily reducible" on May 2, 2018, Reed filed this lawsuit on May 31, 2018. (Doc. 1; Doc. 70, ¶ 11; Doc. 77, ¶ 12). The following week on June 6, 2018, Reed met with a nurse and again complained about the hernia. (Doc. 70, ¶ 12; Doc. 77, ¶ 12). She scheduled an appointment with Dr. Larson. At the appointment with Dr. Larson on June 13, 2018, Reed reported that the hernia was not reducible, had not been reducible for six months, would not stay in place, was growing in size, and was causing significant pain. (*Id*.). Dr. Larson still described the hernia as "easily reducible" but referred Reed for a general surgery consult, ordered a permit for a low bunk, ordered a low gallery permit, and prescribed Tylenol for pain. (*Id*.).

On June 20, 2018, Wexford approved the referral for Reed to have a surgical consult for a hernia repair. (Doc. 77, ¶ 13). This referral was not tantamount to approval for surgery, but rather approval for consultation about surgery. Even after a surgeon recommended surgery, Wexford had final authority over any decision regarding surgery. (*Id*.).

5

On August 9, 2018, Reed met with Dr. Dalencourt, a non-Wexford outside general surgeon. (Doc. 70, ¶ 14; Doc. 77, ¶ 14).  Surgical repair of the hernia was deemed "elective," and Reed requested the surgery.  (Doc. 70, ¶ 17; Doc. 77, ¶¶ 16-17).  Wexford approved the request for surgery on August 27, 2018.  (*Id.*).  Reed filed a request for emergency treatment of the hernia on September 4, 2018, and a nurse issued him a disciplinary ticket for doing so one day later.

Dr. Dalencourt scheduled the procedure for September 21, 2018.  (Doc. 70, ¶ 18; Doc. 77, ¶ 17).  The procedure was performed on that date.  (*Id.*).  Complications during or after surgery included a retracted right testicle, nerve damage, chronic pain, and blood clots.  Reed ultimately lost his right testicle.

## LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure governs summary judgment motions. According to that rule, summary judgment is appropriate only if the admissible evidence, considered as a whole, shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  *See Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1105 (7th Cir. 2015) (citing FED. R. CIV. P. 56(a)).  Rule 56 imposes an initial burden of production on the party moving for summary judgment to inform the district court why a trial is unnecessary. *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  This requirement is not particularly onerous.  The movant's initial burden may be discharged by showing—based on the pleadings, affidavits, and/or information obtained in discovery—the lack of any genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  A genuine issue of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When presented with a motion for summary judgment, the Court does not decide the truth of the matters presented, and it cannot "choose between competing inferences or balance the relative weight of conflicting evidence." *Anderson*, 477 U.S. at 248; *Hansen v. Fincantieri Marine Grp., LLC,* 763 F.3d 832, 836 (7th Cir. 2014) (citations omitted).  The Court must instead "view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Hansen*, 763 F.3d at 836.  If the "evidence is such that a reasonable jury could return a verdict for the nonmoving party[,]" then a genuine dispute of material fact exists. *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016).

## DISCUSSION

The Eighth Amendment prohibits cruel and unusual punishment of incarcerated persons. *See* U.S. CONST., amend. VIII.  When considering an Eighth Amendment claim for constitutionally deficient medical care against an individual medical professional, the Court applies a two-part analysis. *Greeno v. Daley*, 414 F.3d 645, 652-53 (7th Cir. 2005).  First, the Court must determine whether the plaintiff suffered from a sufficiently serious medical condition, from an objective standpoint. *Id*.  Second, the Court must determine whether the defendant responded with deliberate indifference, from a subjective standpoint. *Id*.  In other words, prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when they exhibit deliberate indifference to an inmate's serious medical need. *Greeno*, 414 F.3d at 652-53; *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).

An Eighth Amendment claim against a private medical corporation, like Wexford, entails a different analysis.  Wexford cannot be liable under Section 1983 for a constitutional deprivation caused by one of its employees simply based on the employment relationship. *Shields v. Ill. Dep't of Corrs.*, 746 F.3d 782, 789 (7th Cir. 2014). *Respondeat superior* liability is not recognized under

7

Section 1983.  *Id*.  This limitation on liability stems from *Monell v. Dept. of Social Services of the City of New York*, 436 U.S. 658, 690-91 (1978), a United States Supreme Court decision holding that a municipality may be liable under Section 1983 for constitutional violations resulting from a policy or custom of the municipality but not based on the misconduct of its employees.  *Id*.  In *Shields*, the Seventh Circuit extended *Monell* to private medical corporations that provide government services, including Wexford.  *Shields*, 746 F.3d at 789 (citing *Iskander v. Village of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982)).

Wexford can only be liable for a constitutional violation that results from a policy, custom, or practice amounting to deliberate indifference by the corporation itself.  *Shields*, 746 F.3d at 789.  A private corporation's deliberate indifference is shown through an express written policy, an implicit policy, or a series of bad acts that raise the inference of deliberate indifference on the part of the corporation.  *McKay v. Odom*, 726 F. App'x 493, 494 (7th Cir. 2018).  In the absence of an explicit policy, a "series of violations must be presented to lay the premise of deliberate indifference."  *Id*.  Isolated acts of misconduct will not suffice to establish deliberate indifference by a private corporation.  *Id*. (citing *Palmer v. Marion County*, 327 F.3d 588, 596 (7th Cir. 2003); *Shields*, 746 F.3d at 796 (citing *Cornfield v. Consolidated High Sch. Dist. No. 230*, 991 F.2d 1316, 1326 (7th Cir. 1993)).  Failure to make a policy can also be actionable.  *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 381 (7th Cir. 2014).

A.   **Underlying Constitutional Deprivation**

There is enough evidence of an underlying constitutional violation to preclude summary judgment here.

1.     Serious Medical Condition

In a case largely characterized by disagreements between the parties at summary judgment, there is no dispute that Reed suffered from an objectively serious medical condition. Both parties agree that Reed's inguinal hernia was sufficiently serious to satisfy the first component of this Eighth Amendment claim. Wexford states that "[f]or purposes of this motion only, Defendant does not dispute that Plaintiff's condition could be viewed as a serious medical need." (Doc. 70, p. 9). The Court agrees that Reed's increasingly large and painful inguinal hernia was sufficiently serious to trigger protection under the Eighth Amendment.

2.     Deliberate Indifference

Genuine issues of material fact surround the deliberate indifference component of this claim. Reed was diagnosed with an inguinal hernia eighteen months before he underwent surgery to repair it. For the first six months, the hernia remained small and asymptomatic. Reed had no complaints about the treatment he received at Centralia.

After transferring to Big Muddy in July 2017, things changed. The hernia steadily and dramatically increased in size. By November 2017, it extended ten inches into Reed's scrotum. When he met with a nurse the following month, Reed explained that the hernia regularly popped out when he coughed, sneezed, or stood, resulting in pain. He was nevertheless instructed to reduce the hernia by pushing it back in place.

Reed was not permitted to see a doctor, Dr. Larson, about his condition until January 2018. In the interim, he suffered from the same symptoms and from pain. When he finally met with Dr. Larson, the doctor told him that the hernia would not be surgically repaired unless and until it became strangulated—a term that Reed did not understand at the time.

In the meantime, Dr. Larson recommended reducing the hernia by pushing it back in place, using the hernia belt for support, using ointment for the rash it caused, and taking Tylenol for his pain. The problem with this treatment plan, according to Reed, was that the hernia was not reducible, the hernia belt was not effective (and often not even in his possession), the ointment was not provided, and the Tylenol did not control his pain. Nevertheless, it is undisputed that the prison medical providers, including Dr. Larson, persisted in this course of treatment until Reed finally underwent surgery in September 2018.

Whether the hernia was reducible is clearly in dispute. Wexford argues that the hernia was always reducible because Reed could manually return the hernia to its compartment by lying down and pushing the hernia back into place. Reed insists that the hernia was not reducible because it immediately popped back out of place when he stood, sneezed, or coughed, and the hernia belt did not work to keep the hernia in place beginning in November 2017.

Even as medical staff characterized the hernia as "easily reducible" or "reducible" in the ten months between November 2017 and August 2018, Reed describes a hernia which became so large and problematic that it would not stay in place unless he was lying down. By his own account, Reed's hernia eventually descended halfway down his leg and prevented him from mobilizing, an account that is supported by the issuance of a low bunk and low gallery permit during the relevant time period.

The effectiveness of Reed's hernia belt as treatment for the hernia is also disputed. Reed consistently complained that that the belt was ineffective because it did not hold the hernia in place. He also reported that the belt was frequently confiscated and returned to him by staff, so he did not have regular use of it. It also caused a rash. Despite Wexford's objections about the effectiveness of the hernia belt and ointment, the record contains ample evidence of Reed's

ongoing prescription for a hernia belt and ointment and complaints from him to raise a genuine dispute about the effectiveness of treatment.

**B.      Motivating Policy, Custom, or Procedure**

The question here is whether a motivating policy, pattern, or practice on the part of Wexford caused the unconstitutional delay or denial of surgery. In January 2018, Reed testified that Dr. Larson told him that surgery was not an option, unless the hernia became strangulated. Although Reed did not know what this meant at the time, the parties agree that hernia strangulation is a life-threatening condition. Wexford counters that it has no such policy, but the facts suggest that this prison medical director was well aware of the policy.

The record contains evidence that a surgical consultation was recommended in April 2018, and that Wexford had an explicit policy to act on such recommendations within five days. However, Wexford did not authorize the surgery consultation until June 2018, for whatever reason, and the consultation did not occur until August 2018.

It is also undisputed that Reed was never actually offered surgery. Dr. Larson and other medical staff consistently described his hernia as being reducible and recommended self-treatment and use of a hernia belt, ointment, and Tylenol. Reed received the referral for a surgical consult several weeks after he filed suit in May 2018. This was also shortly after Wexford's hernia policies came under attack in several other lawsuits,[2] including the class action *Bryant v. Wexford*, Case No. 18-cv-2192 (C.D. Ill.).

This case is like another one involving the same medical condition, prison, treating physician, and policy: *Broaddus v. Wexford Health Sources Inc.*, No. 15-cv-01339, 2018 WL

---

[2] Reed identifies the following other lawsuits targeting Wexford's policies, practices, and procedures for hernia treatment: *Barnes v. Sood, et al.*, No. 15-cv-4088 (C.D. Ill.); *Mitchell v. Sood, et al.*, No. 16-cv-4012 (C.D. Ill.) and *Mitchell v. Bautista, et al.*, No. 16-cv-4154 (C.D. Ill.) (consolidated); *Noser v. Smith, et al.*, No. 18-cv-3050 (C.D. Ill.); and *Bryant, et al. v. Baldwin, et al.*, No. 18-cv-2192 (C.D. Ill.) (class action).

11

1565603 (S.D. Ill. Mar. 30, 2018).  In *Broaddus*, a former inmate sued Wexford and Big Muddy's health care unit administrator after his medical providers, including Dr. Larson, ignored his complaints about a hernia in furtherance of Wexford's policy of denying hernia surgery and instead taking a "wait and watch approach" to save on costs.  *Broaddus*, 2018 WL 1565603, at *1.  The HCU administrator was granted summary judgment, but Wexford was not.  *Id*.

As for Wexford, the Court explained that *Monell* liability arises in three contexts.  *Id*. at *5.  First, a plaintiff may point to an explicit "policy statement, ordinance, regulation, or decision officially adopted and promulgated by the body's officers."  *Id*. (citing *Glisson*, 849 F.3d at 379 (7th Cir. 2017) (quoting *Los Angeles County v. Humphries*, 562 U.S. 29, 35 (2010)).  Second, a plaintiff may show that a custom was created by "'those whose edicts or acts may fairly be said to represent official policy.'"  *Id*. (citing *Glisson*, 849 F.3d at 379 (quoting *Monell*, 436 U.S. at 690-91)).  Third, a plaintiff may establish a constitutional deprivation through a widespread custom or practice.  *Id*. (citing *Glisson*, 849 F.3d at 379).  Liability in this context extends to customs "so permanent and well settled as to constitute a custom or usage with the force of law" even if they receive no formal approval.  *Id*. (citing *Monell*, 436 U.S. at 91 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970)).  Evidence of a policymaking official's acquiescence to the unconstitutional practice is sufficient to establish a custom.  *Id*. (citing *McNabola v. Chicago Transit Authority*, 10 F.3d 501, 511 (7th Cir. 1993)).  It is also sufficient to present proof that the practice is "so long standing or widespread" that it would "support the inference that policymaking officials 'must have known about it but failed to stop it.'"  *Id*. (quoting *Brown v. City of Fort Lauderdale*, 923 F.3d 1474, 1481 (11th Cir. 1991)).

The Court denied Wexford's motion for summary judgment, after finding that a jury could reasonably infer a "widespread and well-settled unconstitutional practice on the part of Wexford and/or its doctors," based on the following:

> . . . The record allows for the reasonable inference that a practice existed such that surgery would not be approved for as long as possible as long as an inmate's hernia was reducible. The Court does not find it unreasonable to infer that this practice by Wexford, a private company, existed for the purpose of cost savings.
>
> This practice may be inferred for many reasons. First, for almost two years, from January 3, 2011 to November 16, 2012, Plaintiff presented to a prison health care provider regarding his hernia, and because Plaintiff's hernia was ultimately reducible each time, there was no deviation from the same conservative course of treatment. In addition, at two separate collegials, Plaintiff was denied a referral for a surgery even though the hernia was a longstanding problem and by Wexford's own admission, was the size of a tennis ball to a softball. One of the surgery denials came after an outside specialist recommended surgery. With each denial, it was referenced that Plaintiff's hernia was reducible.
>
> After Plaintiff's second denial for surgery, he presented to healthcare roughly six times before he was ultimately approved for surgery. On one of these occasions, one of Plaintiff's testicles was swollen and another, a medical emergency exists and Plaintiff was in so much pain that he had to be placed on Vicodin. Yet, each time, his hernia was reducible, and still no surgery was approved. Surgery was not performed until an outside emergency room doctor stated that Plaintiff must have the hernia surgically repaired.
>
> Additionally, though Plaintiff cannot recover against Defendant Kerr, her statement at the October 2013 meeting that Plaintiff was not getting surgery is evidence of the aforementioned policy. The fact that a health care administrator who is unable to make treatment decisions is aware that an inmate is not going to get a surgery for his longtime problematic hernia is strong evidence of a common condoned practice among healthcare providers of not approving surgeries for reducible hernias.
>
> There is also plenty of evidence to allow a jury to reasonably infer that this policy was well-settled, and that it was so widespread that even if not formally approved by Wexford policymakers, they had to have known about it and did nothing: Plaintiff was subjected to the same conservative treatment in the face of recurring and worsening problems for at least three years. Additionally, it cannot be said that the course of treatment to which Plaintiff was subjected was not the result of one or two isolated physicians at one facility. From September 2010 to October 2013, at least five different Wexford doctors at two separate prison facilities were involved in Plaintiff's care. Plaintiff's care was discussed at three separate collegial reviews before October 2013 involving three different doctors and Plaintiff was not approved for a surgery. There is no bright line rule that establishes what constitutes a widespread custom or practice, *Wilson v. Cook County*, 742 F.2d 775, 780 (7th Cir. 2014); however, the Court is confident that, here, the number of doctors

> involved and the fact that the consistent course of conservative treatment occurred at two separate prisons are both not only evidence of the policy itself, but also evidence of a well-established and widespread policy.
>
> There is also no doubt that this policy was violative of the Eighth Amendment. . . . Here Wexford's practice of refusing to approve a hernia repair surgery as long as the hernia was reducible flew in the face of Plaintiff's repeated pain and other problems, as well as, a recommendation from an outside specialist. A jury could easily infer that this practice was not based on the professional medical judgment of the physicians carrying it out. Though Plaintiff ultimately received surgery, it was in spite of, and not due to, Wexford, and there is no doubt, with the facts taken in Plaintiff's favor, that because of this practice Plaintiff suffered needless pain for an extended period of time.

*Broaddus.*, 2018 WL 1565603 at *5-6. The District Court issued this decision on March 30, 2018, during the time period when Reed's claim arose. The facts and analysis in *Broaddus* are nearly interchangeable with this case.

Reed's claim arises from Wexford's policy, custom, or procedure of delaying or denying hernia surgery for non-strangulated, non-incarcerated hernias, even when an inmate complains of symptoms that include ongoing pain. Reed maintains that this policy caused the delay in necessary hernia surgery and made use of a "wait and watch" approach each time the hernia was deemed "reducible." Evidence of this policy can be gleaned from the consistent recommendation to "reduce" a hernia that was arguably not reducible, make use of an ineffective (and frequently unavailable) hernia belt, and use ointment for the resulting rash, even in the face of complaints that the hernia was rapidly growing causing pain, and preventing activity. Reed was given the same recommendation for almost a year, despite consistent complaints and requests for surgery. This was after Dr. Larson told him that surgery would be denied, unless the hernia was deemed strangulated.

A jury could infer from this record and the public record that Wexford had an unconstitutional policy, custom, or practice of delaying or denying surgical referrals for painful and symptomatic hernias that are not incarcerated or strangulated. A jury could also infer that

14

Reed only received the surgery when he did because of this and other lawsuits filed against Wexford for their inadequate treatment of hernias. While he cannot recover from Dr. Larson for an Eighth Amendment violation, the Court finds that a genuine issue of material fact precludes summary judgment against Wexford because of the motivating policy, customs, or procedures described herein.

Rule 56 authorizes summary judgment only if "**the movant**" shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a) (emphasis added). Wexford is the movant and has not shown the absence of a triable issue. *Celotex*, 477 U.S. at 323. At this stage, any doubt about the existence of a genuine issue for trial is resolved in favor of the non-moving party, Reed. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Cain v. Lane*, 857 F.2d 1139, 1142 (7th Cir. 1988). Genuine issues of material fact preclude summary judgment here. Accordingly, the pending motion for summary judgment (Doc. 69) shall be denied. Because the Court reached this decision without considering the Declaration of Dr. Clay DeMattei, the related Motion to Strike Declaration of Dr. DeMattei from Consideration on Summary Judgment (Doc. 81) shall be dismissed.

## DISPOSITION

**IT IS HEREBY ORDERED** that Defendant Wexford Health Sources, Inc.'s Motion for Summary Judgment (Doc. 69) is **DENIED**, and the Motion to Strike (Doc. 81) is **DISMISSED** without prejudice. The Court will take up the pending Motion to Bar Plaintiff's Expert Testimony (Doc. 71) in a separate order.

**IT IS SO ORDERED**.

DATED: 9/27/2022                                      s/J. Phil Gilbert
                                                     **J. PHIL GILBERT**
                                                     **United States District Judge**

15