## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **RECO REED, B18431,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 18-cv-01182-JPG** |
| | ) | |
| **WEXFORD HEALTH SOURCES, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### MEMORANDUM AND ORDER

    This matter comes before the Court on Defendant Wexford Health Sources, Inc.'s motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) or, in the alternative, for a new trial pursuant to Federal Rule of Civil Procedure 59 (Doc. 148).  Plaintiff Reco Reed has responded to the motion (Doc. 157), and Wexford has replied (Doc. 161).[1]  For the reasons set forth below, the motion shall be **DENIED**.

    This case was tried before a jury in April 2023 on the question of whether Wexford maintained a policy of refusing to authorize surgical repair of abdominal/inguinal hernias unless the hernia was strangulated or incarcerated.[2]  (Doc. 118).  Specifically, Reed claims that this policy caused a delay in surgical repair of his abdominal hernia until several months after he filed this

---

[1] To the extent Wexford's reply raises new arguments that it did not address in its original motion, the Court disregards all new arguments.  *Wright v. United States*, 139 F.3d 551, 553 (7th Cir. 1998).

[2] An inguinal hernia occurs when tissue, such as part of the intestine, protrudes through a weak spot in the abdominal muscles, resulting in a bulge that can be painful and may lead to serious complications. If the hernia can be pushed back into place, it is considered "reducible."  When the contents of the hernia become trapped in the abdominal wall, the hernia is considered "incarcerated."  And, when blood flow is cut off to the trapped tissue, the hernia is considered "strangulated."  A strangulated hernia can be life-threatening if left untreated.  *See* https://www.mayoclinic.org/diseases-conditions/inguinal-hernia/symptoms-causes (site last visited March 20, 2024).

lawsuit, and the jury was asked to determine whether Wexford's failure to timely repair the hernia or treat his hernia pain amounted to deliberate indifference that caused Reed harm.

At the close of evidence, Wexford moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a).  Wexford argued that the evidence did not support a finding of corporate deliberate indifference or a finding that Wexford caused Reed to suffer any harm.  The Court denied Wexford's motion.   The jury then returned a verdict of $250,000 in compensatory damages and $500,000 in punitive damages (Doc. 131), and the Court entered judgment accordingly on April 10, 2023 (Doc. 135).

On May 8, 2023, Wexford renewed its motion for judgment as a matter of law pursuant to Rule 50(b) on Reed's Eighth Amendment claim.  Wexford additionally argued that the amount of compensatory damages for emotional pain and suffering was not rationally connected to the evidence, and the punitive damages award was so excessive that it denied due process in violation of the Fourteenth Amendment.  Wexford also moved for a new trial under Rule 59, challenging the Court's evidentiary rulings as erroneous and prejudicial and challenging the verdict as being against the manifest weight of the evidence.  The trial proceedings are discussed below, only to the extent they are pertinent to the pending motion.

## I.    Renewed Motion for Judgment as a Matter of Law

Under Federal Rule of Civil Procedure 50(a), the Court may grant judgment as a matter of law during trial, if "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  *See* FED. R. CIV. P. 50(a)(1).  If the Court denies the motion at trial, the moving party may renew it after entry of judgment on the verdict.  *See* FED. R. CIV. P. 50(b).  In response to a

post-verdict motion under this rule, the Court may allow the judgment to stand, order a new trial, or direct entry of judgment as a matter of law.  *See id.*

This rule sets a high bar.  *Ruiz Cortez v. City of Chi.*, 931 F.3d 592, 601 (7th Cir. 2019). When presented with a motion for judgment as a matter of law under Rule 50, the Court should consider all of the evidence, draw all reasonable inferences in favor of the non-moving party, refrain from credibility determinations, and avoid weighing evidence.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Hakim v. Safariland, LLC*, 79 F.4th 861, 868 (7th Cir. 2023).  "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'"  *Reeves*, 530 U.S. at 151 (quoting 9A C. Wright & A. Miller, *Federal Practice and Procedure* § 2529, at 300 (2d ed. 1995)).  When construing the evidence in this light, the Court concludes that a reasonable jury could find for Reed, so this motion is **DENIED**.

A.  <u>**Motions for Judgment as a Matter of Law**</u>

The issue at trial was whether Wexford had a policy[3] of refusing to authorize surgical repair of abdominal hernias unless the hernia was strangulated or incarcerated and whether this policy caused Reed to suffer harm.  (*See* Doc. 49, Count I; Doc. 87, p. 2; Doc. 118, p. 2; Doc. 136, pp. 14-15).  As a private corporation that contracted to provide medical services to inmates in the Illinois Department of Corrections, Wexford was subject to § 1983 liability much like a

---

[3] The jury instructions defined "policy" as "a custom or practice that is persistent and widespread, so that it is Defendant Wexford's standard operating procedure.  A persistent and widespread custom or practice may be a policy even if Defendant Wexford has not formally approved it, so long as Plaintiff Reed proves that a policy-making official knew of the custom or practice and allowed it to continue." (Doc. 136, p. 14) (quoting Jury Instruction ("JI") No. 14 (Version 3)).

municipality under *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658 (1978). *See Shields v. Illinois Dept. of Corr.*, 746 F.3d 782 (7th Cir. 2014). *Respondeat superior* liability does not apply to either one under § 1983. *Id*. (citing *Iskander v. Village of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982)). A private medical corporation cannot be liable under § 1983, unless an unconstitutional policy or custom of the corporation, itself, caused the constitutional violation at issue. *Id*.

A plaintiff must prove three things to establish liability under *Monell*. First, the plaintiff must point to: (a) an express policy that, when enforced, caused a constitutional deprivation; (b) a widespread practice that, although not authorized by written law or express policy, was so permanent and well settled as to constitute a custom or usage with the force of law; or (c) a constitutional injury that was caused by a person with final decision-making or policy-making authority. *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019). Second, the plaintiff must establish that the defendant was culpable, meaning that the policymakers were deliberately indifferent to a known or obvious risk that a policy or custom would lead to constitutional violations. *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 407 (1997). Third, the defendant's policy must "directly cause[ ] a deprivation of federal rights." *Id*. at 415. In other words, the defendant's own actions were the "moving force" behind the plaintiff's injuries. *Id*. at 404. These three elements are addressed, in turn, below.

### 1. Policy or Practice of Refusing to Authorize Surgical Repair of Abdominal Hernias Unless Hernia Was Strangulated or Incarcerated

Wexford argues that the evidence was insufficient for a jury to conclude that it had a policy of refusing to authorize surgical repair of abdominal hernias unless the hernia was strangulated or incarcerated. According to Wexford, Reed presented evidence of a policy in the form of a

widespread practice by relying on three sources, including: (1) the opinion of Reed's expert, Dr. Clay DeMattei, that Wexford refuses surgical consultation "until there is an emergency or someone files a lawsuit" based on his review of 6-10 other inmate hernia cases involving reducible, strangulated, or incarcerated hernias (Doc. 139, pp. 137-38, 162); (2) Reed's own testimony that Dr. Larson told him Wexford does not do hernia surgery (Doc. 138, p. 63); and (3) Reed's own experience (Doc. 149, p. 26).

Reed counters that the jury heard evidence of Wexford's unwritten and written hernia policies from both parties.  Wexford's own expert, Dr. Glen Babich, introduced evidence of the private medical corporation's written policy as Exhibit 5.  (Doc. 139) (Transcript of Trial ("Tr.") at 254:15-25 – 255:1-21).  As written, the policy does not contemplate surgery for hernia patients with abdominal wall hernias deemed stable or reducible, until the hernia becomes strangulated or incarcerated.  (Doc. 139, pp. 133-34).  Dr. Babich explained the policy, as follows:

> Section A. reads: "Patients with stable abdominal wall hernias are not, in general, candidates for" – and that word means hernia surgery – "and will be monitored and treated with appropriate non-surgical therapy." . . . . "Hernias which do not impact on an inmate's activities of daily living in this setting would not be a consideration for a repair." . . . That if the patient can function, do everything, work, do all their other activities and they're not having any real issues, then it's okay to defer surgery and do the, the monitor and watch that we had heard referred to earlier.  Because there are complications that can occur with the surgery.

(Doc. 139: Tr. 257:22-25 - 258:1-14).  Dr. Babich testified that one risk associated with a reducible hernia is that it will grow in size and become incarcerated or strangulated.  (Doc. 139: Tr. 295:10-16).  According to Wexford's written policy, hernia patients become candidates for urgent surgical referrals when a hernia reaches this point.  (Doc. 139: Tr. 258:20-22; Ex. 5, § B).  From this, a reasonable jury could conclude that Wexford waits for an emergency before authorizing surgery.

Dr. DeMattei also observed this policy or practice in 6-10 other cases he reviewed. (Doc. 139, pp. 137-38, 162). Wexford's hernia policies came under attack in several other lawsuits,[4] including the class action filed just before Reed filed this suit, *i.e.*, *Bryant v. Wexford*, Case No. 18-cv-2192 (C.D. Ill.). Reed's expert opined that Wexford's policy was to delay surgical consultation and elective surgery until an emergency developed or suit was filed. *Id*.

Reed offered personal testimony about Wexford's policy. According to his testimony, Reed's hernia grew in size dramatically over the course of a year at BMRCC, until it descended into his right testicle. Whenever he tried to reduce it by pushing it back into place, the hernia would pop out and cause pain when he stood, coughed, or sneezed. He was not seen by a doctor about his complaints until January 2018. When he requested surgery in January 2018, Dr. Larson told him that they (Wexford) would not approve it:

> Q. Ok. If it was in January [the Plaintiff spoke with Dr. Larson], did you have any discussion with him about getting approval for surgery?
> A. Yes, I talked to him about it, and he said I can have surgery when I go home, they don't do surgery for hernias.
> *** 
> Q. and what was it that Dr. Larson told you when you say they won't do surgery---I kind of got distracted. What was your comment again that he told you?
> A. Larson said I can have surgery when I go home, they don't do hernia surgeries.
> Q. And when you say *they*—
> A. Wexford.
> Q. Who is he referring to?
> A. Wexford.
> Q. Okay. Did he tell you why?
> A. No.

---

[4] Reed identifies the following other lawsuits targeting Wexford's policies, practices, and procedures for hernia treatment: *Barnes v. Sood, et al.*, No. 15-cv-4088 (C.D. Ill.); *Mitchell v. Sood, et al.*, No. 16-cv-4012 (C.D. Ill.) and *Mitchell v. Bautista, et al.*, No. 16-cv-4154 (C.D. Ill.) (consolidated); *Noser v. Smith, et al.*, No. 18-cv-3050 (C.D. Ill.); and *Bryant, et al. v. Baldwin, et al.*, No. 18-cv-2192 (C.D. Ill.) (class action).

(Doc. 138: Tr. 26:21-15 – 27:1-6).  Reed testified that when he requested treatment with an outside provider, Dr. Larson again admitted that "[w]e do not do hernia surgeries."  (*Id*.; Tr. 41:12-16). Dr. Larson instead instructed him to reduce the hernia, wear a hernia belt for support, and use ointment for the rash it caused.  The problem, according to Reed, was that the hernia was not reducible, the hernia belt was often unavailable, and the ointment was not provided or was ineffective.  By the time surgery was performed, Reed's hernia was so large that he had to prop it up with his hand while mobilizing.

Dr. Babich admitted on cross-examination that the written policy also omitted pain as a factor in hernia treatment decisions.  (Doc. 139: Tr. 310:17-25 – 311:1-6).  Dr. DeMattei testified that Reed was not treated for his hernia pain or given pain medication.  (Doc. 139: Tr. 139:15-21). And, Reed confirmed that Wexford ignored his regular complaints of hernia pain and disability between March 2017 and September 21, 2018.[5]  (Doc. 138: Tr. 17:5-25 – 18:1-4; 82:1-2).

From the evidence presented at trial, the jury could reasonably conclude that Wexford had a policy of refusing to authorize treatment or repair of abdominal hernias until the hernia became strangulated or incarcerated or suit was filed.

## 2.  Corporate Deliberate Indifference

As for this second element, Wexford argues that Reed failed to prove corporate fault.  To do so, Reed was required to show that Wexford's policymakers were deliberately indifferent to a known or obvious risk that a policy or custom would lead to constitutional violations.  *Brown*, 520

---

[5] Reed was housed at Centralia Correctional Center when his hernia symptoms began in March 2017, and he transferred to Big Muddy River Correctional Center in August 2017.  *Id*.  Although Wexford was responsible for medical staffing at both facilities, Reed's primary complaints of hernia pain and disability arose at BMRCC, after he transferred there.

U.S. at 407.  In other words, Wexford's policy or custom must demonstrate that the corporation acted, or failed to act, with conscious disregard for known or obvious risks to inmate health or safety, *i.e.*, deliberate indifference.  *LaPorta v. City of Chi.*, 988 F.3d at 986-87 (7th Cir. 2021).

Wexford claims that Reed failed to satisfy this element because he offered no evidence of specific instances or refusals to authorize surgical repair of abdominal hernias until they were strangulated or incarcerated.  Therefore, the jury had no basis to infer Wexford's policymakers' knowledge of the practice.  (Doc. 149, p. 29) (citing *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 236 (7th Cir. 2021) (finding no fault without prior knowledge of similar violations); *Oklahoma City v. Tuttle*, 471 U.S. 808, 824 (1985)).

Reed counters that evidence of Wexford's conscious disregard of a known or obvious risk abounded.  (Doc. 157, pp. 22-23).  Its policy, as written, was "hands off."  *Id*.  According to the explicit policy language, an inmate became a candidate for treatment only when an abdominal wall hernia became strangulated or incarcerated to the point it presented an emergency.  *Id*. at 23.  Until then, the policy did not contemplate pain as a factor in treatment of hernias.  *Id*.  Reed's case was marked by complaints of ongoing pain and disability, requests for treatment of hernia pain, and requests for hernia surgery, as noted in his medical records and as exemplified in his testimony.  When viewed from this perspective, a reasonable jury could find that Wexford's hernia policy reflected deliberate indifference and fault on the part of the corporation.

### 3.  Moving Force Causation

The final element of this claim is causation.  For liability to arise under § 1983, Wexford's policy must be the direct cause of Reed's federal rights deprivation and serve as the "moving force" behind it.  *Dean*, 18 F.4th at 235; *Brown*, 520 U.S. at 404.  According to Wexford, Reed has not shown "moving force" causation because he was approved for surgery before his abdominal wall

hernia became incarcerated or strangulated.  (Doc. 149, pp. 29-30).  Wexford's authorization of this elective surgery shows--conclusively, according to Wexford--that Reed was not denied or delayed treatment pursuant to its policy.  Wexford argues that Reed's experience supports no finding that the corporation's policy caused his constitutional deprivation.  *Id*.

The Court disagrees.  The jury could have reached its verdict by finding that Wexford's policies caused the delay in Reed's treatment.  Reed complained of hernia symptoms beginning in March 2017.  He did not undergo surgery until September 21, 2018.  For much of his time at BMRCC, he complained of an enlarging hernia, pain, and disability.  Reed requested and received no meaningful treatment, even as his symptoms worsened.[6]  The jury could reasonably conclude that Wexford's hernia policy caused him to suffer unnecessarily prolonged pain, delayed his necessary hernia surgery, and led to post-operative complications that included castration of his right testicle.  (Doc. 139, pp. 158-59).

Based on this evidence and more, a jury could conclude that Wexford's policy was the moving force behind Reed's constitutional deprivation.

### B.  Motion for Judgment as a Matter of Law on Punitive Damages

Wexford also seeks judgment as a matter of law on punitive damages.  (Docs. 148-49).  Reed requested $150,000 in punitive damages at trial, and the jury awarded him $500,000.  (Doc. 131).  This is more than three times the amount Reed requested for punitive damages.  *Id*.

The Fourteenth Amendment Due Process Clause "prohibits imposition of grossly excessive or arbitrary punishments on a tortfeasor."  *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S.

---

[6] Reed even testified that guards searched him for carrying contraband in his pants, only to discover his hernia instead of contraband.

408, 416 (2003).  When reviewing an award of punitive damages, the United States Supreme Court has established three criteria.  First, a court must consider "the degree of reprehensibility of the defendant's misconduct."  *Campbell*, 538 U.S. at 418.  Second, it must evaluate "the disparity between the actual and potential harm suffered by the plaintiff and the punitive damages award."  *Id*.  Third, the court must consider "the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases."  *Id*.  Wexford points out that when considering the ratio of punitive to compensatory damages, "few awards exceeding a single-digit ratio 'to a significant degree' will satisfy due process."  *Id*. at 425.  And, when compensatory damages are substantial, a lesser ratio (perhaps equal to compensatory damages) can reach the outermost limit.  *Id*.

Wexford argues that the evidence supports no punitive damages award.  Punitive damages serve the purpose of punishing or deterring reprehensible conduct much like criminal penalties.  In the Eighth Amendment context, the standard for recovering punitive damages is conduct that is "motivated by evil motive or intent, or [that] . . . involve[ed] reckless or callous indifference to the federally protected rights of others."  *Smith v. Wade*, 461 U.S. 30, 56 (1983).  Wexford points out that punitive damages will not have a deterrent effect here because utilization management impacted or delayed Reed's care and no longer occurs.  (Doc. 139, p. 241).

Punitive damages were well within the discretion of the jury to award, and the jury made the conscious decision to award them here.  During closing arguments, Reed's counsel made clear that the jury was free to give Reed nothing at all.  (Doc. 140, p. 354).  Reed requested and received $250,000 in compensatory damages.  He requested $150,000 in punitive damages and was awarded $500,000 instead.  The facts of this case show a plaintiff whose delay in surgery during his incarceration caused long-term and persistent pain, disfigurement, disability, embarrassment,

10

disciplinary action, and post-operative complications that included castration of his right testicle. In light of Reed's ongoing complaints of untreated, prolonged, and persistent pain, the Court finds that the 2:1 ratio of punitive to compensatory damages is not so excessive as to deny due process.

For the foregoing reasons, the Court declines to enter judgment as a matter of law in Wexford's favor on liability or damages and will let the judgment stand.

## II.     Motion for a New Trial

Under Federal Rule of Civil Procedure 59(a)(1)(A) ("Rule 59"), a party may move for a new trial within 28 days of the judgment.  The Court is authorized to grant this relief "for any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a)(1)(A).  This includes instances in which the verdict is against the manifest weight of the evidence or the trial was unfair to the moving party.  *Venson v. Altamirano*, 749 F.3d 641, 657 (7th Cir. 2014); *Kapelanski v. Johnson*, 390 F.3d 525, 530 (7th Cir. 2004).  A verdict is against the manifest weight of the evidence only if, viewing the evidence in favor of the non-moving party, no rational jury could have rendered the verdict.  *Hakim*, 79 F.4th at 868; *EEOC v. AutoZone, Inc.*, 809 F.3d 916, 919 (7th Cir. 2016).  Because the trial was fair to the parties and the verdict was supported by sufficient evidence, Wexford's motion is **DENIED**.

### A.   <u>Did the Court's Evidentiary Rulings Deny Wexford a Fair Trial</u>?

A jury verdict will be reversed because of erroneous evidentiary rulings only upon a clear showing that the error affected "a substantial right of the party." *Spray-Rite Serv. Corp. v. Monsanto Co.*, 684 F.2d 1226, 1244 (7th Cir. 1982) (quoting FED. R. EVID. 103).  When evaluating evidentiary rulings, great deference is given to a district court's management of discretionary pretrial and trial matters.  *Ramirez v. Sween*, App. No. 21-2368, 2022 WL 1439397, at *1 (7th Cir. 2022) (citing *United States v. Causey*, 748 F.3d 310, 316 (7th Cir. 2014)).  Even where the district

court made an error, that error provides no basis for reversal if it did not affect the defendant's substantial rights. *Id*. (citing FED. R. CIV. P. 61). The jury verdict will be affirmed if the errors were harmless. *Id*. Upon review of the record, this Court finds that any errors were harmless, and the jury's verdict is otherwise supported by sufficient evidence.

### 1. Did the Court Err in Allowing Expert Testimony about Wexford's Customs, Practices, and Habits in Providing Care to Inmates with Hernias?

Wexford complains that, over its pretrial motions and trial objections, Reed's expert was allowed to testify that Wexford had a policy of not sending patients with hernias for surgical consultation until an emergency arose or a lawsuit was filed. According to Wexford, neither the expert's opinion, nor the bases for it, were disclosed during discovery; the testimony was not helpful to the jury because it constituted a legal conclusion on an element of Reed's claim and amounted to improper speculation on Wexford's mental state; and the opinion was not based on reliable methodology.

As for the timing of these disclosures, the Court granted *both* parties additional time to name experts and produce reports. Neither party fully disclosed this information before the original discovery deadline. This was due, in part, to the fact that the original scheduling order included no deadlines for expert disclosures. (*See* Docs. 28, 65-68). The COVID-19 pandemic also caused delays. (Doc. 66) (citing Admin. Orders 261 and 266). In addition, both parties waited until the close of discovery to address expert disclosures for the first time. (Docs. 67, 68).

On the original discovery cutoff date of November 16, 2020, Reed requested an extension of time for expert disclosures, after Wexford disclosed the names of four non-retained experts, two known treaters, and two defendants as potential witnesses just hours before the close of discovery. (Docs. 67, 68 at ¶ 2). Wexford did not produce any reports with its disclosure. *Id*. The Court

granted Reed's request and set a deadline for Reed to depose Wexford's expert(s) (March 16, 2021), a deadline for Reed to disclose rebuttal expert(s) (May 17, 2021), a deadline for Wexford to depose Reed's expert(s) (June 16, 2021), and an extended deadline for both parties to complete discovery (June 16, 2021) and file dispositive motions (July 16, 2021).  (Doc. 67).

On March 16, 2021, Reed's counsel deposed Dr. Babich, who Wexford described as a non-retained corporate representative and a non-treating physician.  (Doc. 68 at ¶ 4).  Wexford produced Dr. Babich's written report at the deposition.  Reed then disclosed Dr. DeMattei as a retained expert and rebuttal witness and produced an expert's report May 17, 2021.  (Doc. 71-1).

The following day, May 18, 2021, Wexford requested an extension of the deadline for Wexford to disclose its retained expert and an extension of time for discovery, citing Reed's disclosure of a retained expert the previous day.  (Doc. 68 at ¶ 5) (citing Ex. B, Plaintiff's Expert Disclosures) (stating "On May 17, 2021, Plaintiff disclosed a retained expert witness. This witness, however, is not a rebuttal witness with regard to Dr. Babich's testimony and in fact has very little to say about Dr. Babich's testimony") (Doc. 68-2, Report of Dr. Clay DeMattei, M.D.).  The Court granted additional time for Wexford to disclose its retained expert/rebuttal witness (July 16, 2021) and for both parties to complete all discovery (August 16, 2021) and file dispositive motions on the merits (September 16, 2021).  (Doc. 68).

As for the bases of the expert opinions, Dr. DeMattei identified the following sources of information on May 17, 2021: Reed's medical records, Reed's deposition, Wexford's expert deposition, other cases where he testified (listed below), and his 25-plus years of experience. Wexford deposed Dr. DeMattei on July 16, 2021.  During this deposition, the defendant had an opportunity to explore all of the expert's opinions and the underlying bases for them.  Wexford also had an opportunity to question Dr. DeMattei on other related cases where he testified as a

witness, including those he disclosed on May 17, 2021: *Barnes v. Wexford*, CDIL 15-4088; *Mitchell v. Wexford*, CDIL, 16-cv-4012 and Consolidated Case(s) CDIL 18-cv-4154; and *Noser v. Wexford*, CDIL 18-3050.  (Doc. 71-1).  Discovery closed on August 16, 2021.

On September 13, 2021, Wexford filed a motion for summary judgment (Doc. 69) and a motion to bar Reed's expert testimony (Doc. 71).  Reed filed a response in opposition to summary judgment, along with a 9-page Declaration of Dr. DeMattei from the *Bryant, et al. v. Baldwin, et al.*, Case No. 18-cv-2192 (C.D. Ill.).  (Docs. 76, 77, 77-1).  Wexford then moved to strike all testimony about other litigation.  (Doc. 81).  The Court denied Wexford's motion for summary judgment and motion to bar, subject to its reserved ruling on certain objections.  (Docs. 88).  The motion to strike was dismissed without prejudice.  (Doc. 87).

Wexford did not request permission to re-depose Reed's expert regarding any of his opinions at any time after his initial deposition, and no supplemental expert disclosures were produced by either party after the close of discovery.  Wexford instead filed numerous motions *in limine* aimed at excluding Dr. DeMattei's testimony.  (Doc. 103).  Reed likewise file motions *in limine* to exclude the testimony of Wexford's expert, Dr. Babich.  (Doc. 106).  The parties' pretrial objections stemmed, in part, from the late disclosure of experts and, in part, from the failure to timely produce complete expert reports.  The Court allowed both experts to testify.  (Doc. 117).

Wexford now challenges as conclusory, unhelpful, and speculative Dr. DeMattei's testimony that Wexford had a policy in which "patients with hernias are not sent for elective surgery, and not even offered consultation with someone who actually can repair the hernia to discuss whether or not it needs to be done [and] for the most part, it continues until there is an emergency or someone files a lawsuit."  (Doc. 149, p. 5) (quoting Doc. 139, Tr. 137).  Wexford asserts that Dr. DeMattei's trial testimony deviated from the opinions disclosed in his expert report

produced during discovery on May 17, 2021 pursuant to Rule 26(a)(2)(B).  Wexford claims that it was not on notice that Dr. DeMattei would offer the opinion he gave at trial based on his review of other cases, and failure to disclose this opinion was unjustified and harmful. (Doc. 149, p. 6).

The Court disagrees.  Wexford received notice of the expert's opinions when Reed produced his expert's report in May 2021.  Dr. DeMattei listed other related cases where he testified or offered opinions.  Wexford had an opportunity to question Dr. DeMattei about all of this during his deposition.  The deposition took place after Dr. DeMattei disclosed his opinions. At trial, Reed's expert did not get into the details of each of the related cases, consistent with Reed's attorney's agreement to avoid lines of questions about other matters that amounted to "trials within a trial."  Reed's attorney focused the inquiry on the general practice of Wexford through their habit, practice, and custom of not treating hernia cases until they're strangulated or incarcerated.  (Doc. 117, pp. 5-6).  Dr. DeMattei generally testified about his experience with other Wexford hernia cases.  Wexford's related pretrial motion to bar expert testimony, motion *in limine*, and/or trial objections were denied.  (*See* Doc. 88).   In addition, Wexford could, and did, cross-examine Dr. DeMattei on his experience, opinions, and bases for his opinions.  (Doc. 139, p. 136). Under the circumstances, the Court finds no error in allowing Dr. DeMattei's opinion testimony.

### 2. Did Reed's Counsel Improperly Inflame the Jury's Passion in Closing Argument by Appealing to its Sympathy?

Wexford separately argues that Reed's counsel appealed to the sympathies of the jury during closing arguments in a manner that violated the "Golden Rule."  (Doc. 149, pp. 19-20).  A "Golden Rule" appeal occurs when the jury is asked to put itself in the plaintiff's position.  *Spray-Rite Serv. Corp.*, 684 F.2d at 1246.   This is "universally recognized as improper because it encourages the jury to depart from neutrality and decide the case on the basis of personal interest

and bias rather than evidence." *Id*.  A district court's ruling on a related objection is given deference because the district court is in the best position to determine whether the conduct or statements caused prejudice.  *Christmas v. City of Chi.*, 682 F.3d 632, 642-43 (7th Cir. 2012).

During closing arguments, Reed's counsel began reading an excerpt from a letter his client wrote, prompting Wexford's "Golden Rule" objection:

| | |
|---|---|
| Mr. Pliura: | My client asked me---because he can't talk now, only the attorneys are---but he asked me to basically become him.  "Yes, I'm locked up, but I'm not the one on trial here.  I'm serving my time but I have rights.  I want you to ask yourself a question: what if it was your father or your brother or your husband" --- |
| Mr. Kinkade: | Objection, Your Honor, personalization |
| Mr. Pliura: | ---"or son"--- |
| The Court: | Pardon |
| Ms. Kinkade: | Improper personalization. |
| The Court: | Overruled. |
| Mr. Pliura: | "No one has said sorry to me. No one has apologized for what happened to me. I want to prevent this from happening again. You have the power to help the next person. Before I go again, what if this was a family member? All I continued to do was to ask for help, ask for pain medicines, ask for surgery, and I never got it until I filed this lawsuit. |

(Doc. 140: Tr. 354:18-25 – 355:1-7).

These remarks might have appealed to the sympathies of the jury.  The Seventh Circuit has explained, however, that "[a]s a general matter, improper comments during closing argument rarely rise to the level of reversible error, and considerable discretion is entrusted to the district court to supervise the arguments of counsel."  *United States v. Thomas*, 933 F.3d 685 (7th Cir. 2019) (quoting *United States v. Wilson*, 985 F.2d 348, 353 (7th Cir. 1993) (internal citation and quotation marks omitted); *United States v. Berg*, 640 F.3d 239, 253 (7th Cir. 2011)).  Here, the Court overruled Wexford's objection and instructed the jury about the law it should apply when deciding liability and damages.  In the process, the Court made clear that the jury must perform its duties fairly and impartially and not allow prejudice or bias to influence its decision.  The Court

16

explained that the jury must decide the facts from the evidence presented, apply the law to the facts, and perform these two duties fairly and impartially:

> You have two duties as a jury. Your first duty is to decide the facts from the evidence in this case. This is your job and yours alone. Your second duty is to apply the law I give you to the facts. You must follow these instructions, even if you disagree with them. Each of the instructions is important, and you must follow all of them. Perform these duties fairly and impartially.

Tr. 340:23-25 – 341:1-5. The jury was explicitly instructed that the lawyers' comments, opening arguments, and closing arguments are not evidence: "[T]he lawyers' opening statements and closing arguments to you are not evidence. Their purpose is to discuss the issues and the evidence." Tr. 342:2-4. According to the Seventh Circuit, a jury instruction which explains that arguments of counsel are not evidence "mitigate[s] the harm potentially caused by improper statements made by counsel during closing argument." *Valbert v. Pass*, 866 F.2d 237, 241 (7th Cir. 1989). Even where a judge overrules a "Golden Rule" objection and does not give a limiting instruction, however, the Seventh Circuit has noted that "any prejudice can often be cured simply by a general instruction that properly informs the jury on the law of damages." *Joan W. v. City of Chi.*, 771 F.2d 1020, 1023 (7th Cir. 1985).

In this case, the Court provided instructions that focused the jury on its proper function and informed the jury of the correct legal standards for determining liability and damages. *Shroyer v. Kaufman*, 426 F.2d 1032 (7th Cir. 1970). Jurors was instructed to "follow these instructions, even if you disagree with them." Tr. 340:2-3. Jurors are presumed to follow the Court's instructions:

> The jury system is premised on the idea that rationally and careful regard for the court's instructions will confine and exclude jurors' raw emotions. Jury routinely serve as impartial factfinders in cases that involve sensitive, even life-and-death matters. In those cases, as in all cases, juries are presumed to follow the court's instructions. *See Greer v. Miller*, 483 U.S. 756, 766, n. 8 (1987).

17

*CSX Transp., Inc. v. Hensley*, 556 U.S. 838, 841 (2009).  *See also Spray-Rite Serv. Corp.*, 684 F.2d at 1246 (citation omitted) (request that jury put itself in the position of plaintiff when deciding damages award was clearly improper, but also harmless, where it was not so prejudicial that it deprived the defendant of a fair trial and jury was also clearly instructed on the law it should apply when deciding liability and damages).

Improper comments made during closing arguments rarely constitute reversible error, and the remarks made during Reed's closing argument do not rise to this level.  *Christmas*, 682 F.3d at 642.  The problematic remarks represented an insignificant portion of the case and the closing argument.[7]  *See Ewing v. 1645 W. Farragutt LLC*, 90 F.4 876, 890-91 (7th Cir. 2024) (no new trial warranted and no prejudice shown from problematic statement made during closing arguments that triggered the defendant's timely objection based on a "golden rule" violation).  At most, the remarks resulted in harmless error, and Wexford has shown no prejudice that was so unfair as to deprive the defendant of a fair trial.

### 3.   Did the Court Err in Admitting Reed's Hearsay Affidavit and Complaint?

Wexford also objects to the introduction of Page 5 of the Complaint[8] at trial.  (Doc. 138, pp. 112-114).  Page 5 is the statement of Reed's claim.  Wexford argues that this page consists

---

[7] Wexford points to one other question that Reed's counsel asked Wexford's expert and then highlighted during closing: "If one of the jurors or anybody in this courtroom had development of a hernia just like what Mr. Reed did, and you were providing care to the patient, and they presented with the exact same series of complaints, same timeline, do you believe it would be appropriate to follow the same exact course that happened with Mr. Reed?"  (Doc. 139, pp. 309, 390).  Wexford vaguely references this question and does not discuss it in any detail. Any argument about this rebuttal question is undeveloped.  *See Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) (arguments that are "undeveloped, conclusory, or unsupported by law" are waived); *see also Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 397 (7th Cir. 2000); *Perry v. Sullivan*, 207 F.3d 379, 382 (7th Cir. 2000).

[8] Wexford refers to this as Exhibit 11, and Reed refers to it as Exhibit 10.  To avoid confusion, the Court will refer to it simply as "Page 5."

entirely of hearsay without exception. *Id.* More specifically, Wexford challenges the Court's decision to allow Reed to recite an allegation that a nurse instructed him to push his hernia back in. (Doc. 149, p. 21) (citing FED. R. EVID. 801(c)). Wexford challenges this ruling as erroneous, by arguing that the allegation was admitted into evidence for the truth of the matter asserted without adequate opportunity to cross-examine Reed. (Doc. 138, pp. 112-14; Doc. 149, p. 22).

Reed points out that Rule 801(d)(2)(D) of the Federal Rules of Evidence "defines as non-hearsay certain hearsay-like evidence." *Aliotta v. National Railroad Passenger Corp.*, 315 F.3d 756, 759 (7th Cir. 2003). This rule excludes the following from the definition of hearsay:

**Rule 801. Exclusions from Hearsay**

**(d)**   **Statements That Are Not Hearsay.**   A statement that meets the following conditions is not hearsay:

**(2)**   ***An Opposing Party's Statement.***   The statement is offered against an opposing party and:

**(D)**   was made by the party's agent or employee on a matter within the scope of that relationship and while it existed

*See* FED. R. EVID. 801(d)(2)(D). Reed points out that he briefly discussed the statement during his direct examination, after the Court took judicial notice of Page 5 of the Complaint. (Doc. 138, pp. 112-14). The brief discussion echoed testimony that both parties introduced through other witnesses without objection at trial. *Id.* at pp. 28, 62, 81, 106, and 308.

Review of the record confirms this. Wexford's expert, Dr. Babich, testified that he reviewed the Complaint when forming his opinion about Reed's case. (Doc. 138, p. 308). Reed's counsel cross-examined Dr. Babich on the information he relied on when forming his opinions. (Doc. 157, p. 13) (citing FED. R. EVID. 702, 703, and 705). Page 5 was part of this information

and was addressed during his testimony.  The Court did not commit clear error in allowing Reed's brief testimony.

### 4.   Did the Court Err in Allowing Reed to Testify to Statements of Dr. Larson?

Relatedly, Wexford challenges Reed's introduction of testimony that Dr. Larson told Reed, "I can have surgery when I go home, they don't do surgery for hernias."  (Doc. 138, pp. 25-26). Dr. Larson is the Wexford physician who was responsible for Reed's medical care during the relevant time period.  Wexford objects to this testimony as a violation of Rule 803(4) of the Federal Rules of Evidence, which excepts from hearsay comments made *to* a medical professional for diagnosis and treatment and not statements made *by* medical professionals.  (Doc. 149, p. 22) (citing *White v. Illinois*, 502 U.S. 346, 355-56 (1992)).  Wexford characterizes Reed's testimony as a self-serving statement rather than a corporate admission.  (Doc. 138, pp. 48-50).  According to Wexford, the corporation never denied a referral for Reed and also approved the elective surgery.  (Doc. 149 p. 23).

Reed counters that this statement is a hearsay exception under Rule 801(d)(2)(D) because it was made by Dr. Larson, Wexford's employee, while treating Reed.  (Doc. 157, p. 15) (citing FED. R. EVID. 801(d)(2)(D)).  Dr. Babich testified about Dr. Larson's employment with Wexford and established that he was employed by the corporation during the relevant time period.  (Doc. 139, p. 286).  Dr. Larson also admitted that he was an employee when he answered the Complaint. (Doc. 23, p. 1).  The statement was excluded from the rule against hearsay because it was made during the course of Dr. Larson's employment, while providing care to Reed, about a matter within the scope of his employment relationship.  *See* FED. R. EVID. 801(d)(2)(D). *See also U.S. v. Paxson*, 861 F.2d  730, 734-35 (7th Cir. 1988) (allowing admission made to a witness by non-defendant vice president as an admission of the company president under Rule 801(d)(2)(D)).

20

Upon review of this matter, the Court finds that its decision to allow testimony about this statement was well within this Court's broad discretion when deciding matters about trial. Standing alone or in combination with any other rulings, the Court's decision provides no grounds for upending the verdict. *U.S. v. Jung*, 473 F.3d 837, 841 (7th Cir. 2007).

### 5. Did the Court Err in Allowing Reed to Testify that Wexford Approved Reed's Surgical Consultation Because Reed Filed Suit?

Wexford challenges Reed's introduction of testimony, argument, or inference that the private medical corporation approved his surgical consultation because he filed this lawsuit. (Doc. 149, p. 23). At trial, there was testimony that: (1) Reed was referred for surgical consultation on April 19, 2018; (2) Reed filed suit on May 31, 2018; (3) Reed was approved for surgical consultation in mid- to late- June 2018; (4) Reed was sent for surgical evaluation on August 4, 2018; and (5) Reed underwent surgery on September 21, 2018. (Doc. 139, pp. 147-48). In addition, the Court granted Wexford's request to take judicial notice and instruct the jury on the following timeline:

One.   Mr. Reed's Complaint was filed on May 31, 2018;
Two.   Dr. Dennis Larson was mailed a copy of the Complaint on June 27, 2018;
Three.  The Court received Dr. Larson's signed Waiver of Formal Service of the Complaint on July 6, 2018; and,
Four.   Wexford Health Sources was mailed a copy of the plaintiff's Complaint on August 5, 2019; and
Five.   The Court received Wexford's signed Waiver of Formal Service of the Complaint on August 20, 2019.

(Doc. 139, p. 316). Dr. Babich also testified that Wexford lacked knowledge of the suit at the time the consultation referral was approved. (Doc. 139, p. 277). Wexford argues that this timeline and testimony should have led the jury to conclude that Wexford was unaware of the lawsuit when it approved the consultation.

But, the jury was free to draw its own conclusions from the above-referenced timeline, Reed's testimony, and each experts' testimony. A reasonable jury could have questioned the credibility of Wexford's expert witness when testifying about Wexford's knowledge of this lawsuit and believed Reed's testimony that he was not authorized for a referral or treatment of his hernia pain until after he filed this lawsuit on May 31, 2018. The Court did not err in taking judicial notice of the timeline or allowing the parties to present testimony and argument about it.

### B. __Was the Verdict Against the Manifest Weight of the Evidence__?

Finally, Wexford maintains that the verdict was against the manifest weight of the evidence. As previously explained, a verdict is against the manifest weight of the evidence only if no rational jury could have rendered the verdict when viewing the evidence in favor of the non-moving party. *Hakim*, 79 F.4th at 868; *AutoZone, Inc.*, 809 F.3d at 919. Wexford does not support its assertion with any independent arguments or citations to facts, and the Court concludes that Wexford received a fair trial. This Court presided over the trial, heard the evidence presented, and reviewed the transcript in connection with the pending motion. When viewing the evidence in Reed's favor, as required at this stage, the Court finds that the jury's verdict had a rational basis and was not against the manifest weight of the evidence.

### III. __Motion for Remittitur__

Wexford seeks remittitur of the punitive damages award of $500,000. (Doc. 149). Wexford argues that this award should be remitted as unconstitutionally excessive. The Fourteenth Amendment Due Process Clause prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor. *Campbell*, 538 U.S. at 416. As explained above, Reed must show that Wexford acted with "evil motive or intent" or with "reckless or callous indifference" to his constitutional rights in order to recover punitive damages in the first place. *Smith v. Wade*, 461

22

U.S. 30 (1983).   However, the jury returned a verdict finding Wexford guilty of corporate deliberate indifference, and this verdict is consistent with a finding of callous disregard in connection with damages.   And, the 2:1 ratio of punitive damages to compensatory damages is well within the bounds of multipliers of compensatory damages that the Supreme Court has found satisfy due process.   *Campbell*, 538 U.S. at 425.   Defendant's motion for remittitur is **DENIED**.

### CONCLUSION

For the foregoing reasons, the Court **DENIES** Wexford's motion for judgment as a matter of law or, in the alternative, a new trial (Doc. 148).   The Court also **DENIES** Wexford's motion for remittitur (Doc. 148).   The Court will address Reed's motion for attorney fees and costs (Doc. 142) and Reed's motion for prejudgment and post-judgment interest (Doc. 144) in a separate order.

**IT IS SO ORDERED.**

**DATED**: April 2, 2024                    s/ J. Phil Gilbert
                                            **J. PHIL GILBERT**
                                            **United States District Judge**

23